WILLIAM F. MULLIN, appellant,

*v.*

ANNIE E. MULLIN et al., respondents.

[Argued November 22d, 1915.   Decided March 6th, 1916.]

The complainant, the oldest of nine children, was under age at his father's death. He conducted his father's business, that of an undertaker, for the benefit of the family. After he attained his majority, his mother, who was sole acting executrix, agreed with him that the profits of the business remaining after the support and maintenance of herself and the infant children, should belong to the complainant in payment

for his services. When the mother died in 1900 complainant was made administrator *de bonis non* of his father's estate. The youngest child was then eight years old. The complainant continued to support the minor children.—*Held*, that he was not chargeable as administrator with the profits of the business during the minority of his brothers and sisters, and that the business became his at the termination of that period from the necessity of the case, especially in view of the act of 1906 prohibiting the conduct of the business of undertaking by any unlicensed person. *Held, also*, that he was chargeable with the value of the tangible assets of the estate used in the business.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevens.

*Mr. Ralph E. Lum,* for the complainant-appellant.

*Mr. Michael J. Tansey,* for the defendants-respondents.

The opinion of the court was delivered by

SWAYZE, J.

The complainant sought as administrator with the will annexed of Peter M. Mullin, deceased, to account in the court of chancery. An account was had before a master and he appeals from the decree confirming the master's report. The fundamental question is whether he is chargeable with the profits of the business of an undertaker, which was conducted by the decedent, complainant's father, in his lifetime and by the complainant since his death. The facts are as follows:

Peter M. Mullin died November 4th, 1891. By his will he directed that his business be continued for the benefit of his wife and children under the direction of his wife and his brother Joseph J. Mullin, who were appointed executors and guardian of his children. He left eight children then living, of whom one has died, and a posthumous son, born April 24th, 1892. The complainant, the oldest child, was about eighteen. The widow, Annie E. Mullin, alone qualified as executrix. Upon her death, in 1900, the brother Joseph J. renounced and the complainant became administrator *be bonis non*. He had assisted his father in the business and continued the business after

his father's death alone, or in connection with his brother Joseph
L. Mullin. On September 24th, 1895, after the complainant had
attained his majority, a formal written agreement was made
between the executrix, William F. and Joseph L., for the con-
tinuance of the business by William F. and Joseph L., in the
name of the estate of Peter M. Mullin, for one year from Octo-
ber 1st, 1895, subject to the right of the executrix to terminate
the agreement on one month's notice. The family of Peter were
to be maintained and educated from the net proceeds of the busi-
ness. The profits, after maintaining and educating the family,
were to be divided—three-sixths to William, two-sixths to Jo-
seph, and one-sixth to the executrix. This arrangement did not
prove satisfactory. Before the end of the year Joseph left and
went into business for himself elsewhere. A new agreement was
then made between the complainant and the executrix. This was
verbal, and is said by the complainant, in his bill to have been an
agreement that the balance of the profits of the business remain-
ing after the support and maintenance of the complainant's
mother and the infant children, should belong to the complainant
in payment for his services. In his testimony the complainant
said that the agreement was that he was to support the children
out of the business, educate, clothe and feed them until they be-
came of age, the profits arising from the business were to be his,
and the business was to be his after the children had arrived at
their majority. The learned vice-chancellor accepted the ver-
sion given in the bill. We think, as will appear, that the prac-
tical result is not different whichever version is correct. The dif-
ference is only a natural difference in the recollection or state-
ment of the effect of a verbal agreement made many years ago,
in a point which at the time was not considered of importance
and probably was not definitely in the mind of either party.
The agreement was made after due deliberation and consulta-
tion of the executrix with counsel and with a brother of the de-
cedent, and we see no reason to doubt the complainant's state-
ment that he entered into the agreement reluctantly and only at
the earnest solicitation of his mother and the priest of the church
he attended. The complainant was a young man, a year past his
majority, who had proved his ability to conduct the business suc-

cessfully for four years, who in that time had built up a good will
for himself, who had another career of promise open to him,
who had an interest in his father's estate, paid to him about the
same time, large enough to furnish him with the small capital
needed to carry on the undertaking business. He was giving up
such prospects as he might have and was binding himself to a
contract which would last until his youngest brother came of
age, seventeen years later, when the complainant would be forty
years old. The contract was, obviously, very much for the benefit
of the widow and minor children, since they secured an assurance
of support and education until each child came of age. The
right of the executrix to make the agreement is challenged by
the defendants because it is said it was not for the equal benefit
of all the children, but gave the younger children more than their
elder brothers and sisters. This is true, but even if that fact
would otherwise invalidate the agreement as to the complainant,
we think it was in the power conferred by the will upon the
executrix to continue the business for the benefit of the widow
and children under the direction of the executrix; and that
direction was meant to apply not only to the conduct of the
business, but to the conduct of the family and the determination
of what was for the benefit of the wife and children. It seems
to us that the testator meant to keep this young family together
until each could make his or her own way in the world. It suits
the present purpose of the defendants to regard this agreement
as merely an agreement for the management of the decedent's
business, and their claim is that the profits of that business, after
the death of the executrix when the complainant was appointed
administrator, are the property of the estate with which the ad-
ministrator is chargeable. This view prevailed in the court be-
low. We regret that we cannot reach the same result as the vice-
chancellor whose views usually command our assent. The error
lies in overlooking the fact that the agreement made between the
executrix and the complainant, in 1896, necessarily ran and
bound both parties until the posthumous child, born in 1892,
attained his majority, in 1913, two years after the present bill
was filed. The complainant could not, and did not, repudiate or
evade his obligation to support the infant children, and now

acknowledges it. It is not questioned that he has performed on his part. This obligation arose out of an agreement which gave him all the profits, and he cannot be held to the performance of the contract on his part and compelled to give up his own rights thereunder. He was not acting in a fiduciary capacity when he made the contract, and the contract did not terminate when he became administrator. Both he and his father's estate remained bound. The case is not altered by the fact that his obligation became less as his brothers and sisters one by one attained their majority. The business of the decedent, as distinguished from the tangible assets of the estate to be mentioned hereafter, consisted only of such good will as might attach to the name "Estate of Peter M. Mullin." We think it doubtful whether in a business of that character, consisting of personal services and evidently dependent largely, if not entirely, upon the personal characteristics of the individual, there could be any good will as late even as four or five years after a man's death. Assuming that there was, as the filial partiality of the complainant seems to have thought there was when he made the agreement, such good will is, at best, a wasting asset, and must become less valuable with each year. The value of the business, so far as that value belonged to the estate, must have decreased as rapidly as the burden of the obligation to support the children. No provision may have been made in express words that the business should be the complainant's when the youngest child attained his majority, in 1913. Such an express provision was hardly necessary. The successful conduct of a business of that character for more than twenty-one years would, in effect, make it his, whether the parties so agreed or not, in the absence of an express covenant on his part not to engage in the business for himself; and there was no such covenant. He would be free to conduct the business in his own name, and we can hardly imagine a business competitor who would be willing to pay for the mere privilege to use the name of a man who had been dead more than twenty-one years. No doubt, the executrix and the complainant looked at the matter practically, and both foresaw that the business would be the complainant's before the contract terminated, in 1913, if, in fact, it was not already his in 1896.

Moreover, seven years before the agreement expired, the good will of the estate of Peter M. Mullin was ended by legislation. In 1906, an act was passed regulating the business of undertaking, and prohibiting under a penalty any unlicensed person from conducting the business. *Comp. Stat. p. 5700.* From that time forward, the estate could not legally carry on the business. At that time three of the children were still under age, and their support and education thereafter was entirely due to the earnings of the complainant.

We have thus far dealt only with the profits of the business as distinguished from the tangible assets that came to the hands of the complainant as administrator. These assets were subject to the same contract giving the profits to the complainant after supporting the minor children until the youngest attained his majority. The complainant raises no question as to his accountability therefor. In the absence of clearer proof, we may assume that the value when the youngest child attained his majority, in 1913, was the same as at the testator's death, *i. e.,* $500. On this amount the complainant is chargeable, with interest, from April 24th, 1913, with annual rests.

As to the effect of the releases, we agree with the vice-chancellor.

The decree, so far as it confirms the master's report and adjudges that the proceeds of the conduct of the undertaking business are a part of the assets of the estate of Peter M. Mullin, and that the legatees are entitled to share therein, must be reversed and the record remitted to the court of chancery for further proceedings in accordance with our opinion.

*For affirmance*—BLACK—1.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, KALISCH, TERHUNE, HEPPENHEIMER, WILLIAMS, TAYLOR—11.